IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

IN RE:          DEQUEEN GENERAL HOSPITAL                    CASE NO. 4:04-bk-75927M
                                                                    (CHAPTER 11)


STREETMAN & MEEKS, PLLC,
DISTRIBUTION AGENT ON BEHALF OF
DEQUEEN GENERAL HOSPITAL, INC. d/b/a
DEQUEEN REGIONAL MEDICAL CENTER                                      PLAINTIFF

V.                              AP NO. 4:07-ap-07284

JCE HEALTHCARE GROUP, LLC, AND
DEQUEEN MEDICAL CENTER, INC.                                         DEFENDANTS


**<u>MEMORANDUM OPINION</u>**

On September 3, 2004, DeQueen General Hospital d/b/a DeQueen Regional Medical

Center (Debtor) filed a voluntary petition for relief under the provisions of Chapter 11.  On July

10, 2007, Streetman & Meeks, PLLC (Plaintiff), as distribution agent on behalf of the Debtor

filed this adversary proceeding against JCE Healthcare Group, LLC (JCE) and DeQueen

Medical Center, Inc. (DMC) (collectively known as the Defendants), alleging numerous counts

asking for a variety of relief arising out of the sale of assets from the Debtor to JCE.

The allegations in the complaint are lengthy and complex.  Count I asks for a turnover of

property of the estate pursuant to 11 U.S.C. § 542 and for an accounting and pre-judgment

interest on all funds recovered.

Count II asks for damages, both compensatory and punitive, for breach of fiduciary duty

1

owed by Defendants to Plaintiff.

Count III asks for judgment for conversion and punitive damages.

Count IV asks for judgment for fraudulent concealment, fraud, deceit, and punitive damages.

Count V asks for damages for breach of contract for delay in closing the sale.

Count VI asks for damages, attorney's fees, costs and expenses for breach of contract.

Finally, Count VII asks that any claim asserted in this case by the Defendants be equitably subordinated pursuant to 11 U.S.C. § 510.

The Defendants, both represented by the same counsel, filed a timely answer to the complaint denying the material allegations asking for relief and pleaded in the alternative, and by way of counterclaim, a contractual right of indemnity pursuant to the agreements involved in the controversy.

Trial on the merits was conducted on October sixth, seventh, and eighth of 2008, in Texarkana, Arkansas.  By agreement of the parties the record was reopened and an additional hearing was held in Little Rock, Arkansas, on May 28, 2009.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) & (O) and the Court has jurisdiction to enter a final judgment in this case.  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

PROLOGUE

The events with which this opinion is concerned will be discussed in considerable detail and are complicated.  The following is a brief summary.  The Debtor filed for relief under the provisions of Chapter 11 of the United States Bankruptcy Code.  The Debtor was interested in selling its assets, which consisted of an operating, not-for-profit hospital located in DeQueen, Arkansas, to DMC.  Also prior to the sale, the Debtor hired JCE to manage the hospital operations for a fee of $15,000.00 per month beginning in December 2004.  DMC was formed by  the owner of JCE.

Negotiations were conducted by the Debtor, JCE, and an active unsecured creditors committee represented by counsel.  In early 2005, an agreement in general was reached for the sale of the Debtor's assets for $3,500,000.00 to the Defendants.  A plan of liquidation was confirmed on June 9, 2005.  Several attempts were made to close the sale, but the closing was postponed by agreement of the parties for reasons hereinafter discussed.   The closing occurred in September of 2005, although the actual date of closing is in dispute.

When the sale was closed, the sale proceeds were distributed first by a title company and then by JCE, as manager of the Debtor.  After deducting closing costs and other disbursements and after paying post-petition accounts payable, the balance of the sale proceeds were paid by JCE to the Plaintiff,  for distribution to pre-petition unsecured creditors. (Pl. Ex. 18a.)

The amount paid by JCE to the Plaintiff was substantially less than was estimated by the plan and the disclosure statement.  Efforts were made by the Plaintiff and JCE to account for the sale proceeds and the perceived shortfall but the issues were  not resolved satisfactorily to the Plaintiff. This adversary proceeding was filed in July 2007.  At the conclusion of the hearing in

3

Texarkana, Arkansas, the Court ordered JCE to hire an independent CPA, to be agreed to by the parties, to prepare an accounting of the sale proceeds. Subsequently, a CPA was hired, and a copy of the his accounting was furnished to the parties and to the Court. Both parties have filed briefs supporting their respective positions.

## DISCUSSION

The record contains voluminous documents, the most important of which are the confirmed plan of reorganization (Pl. Ex. 2), the asset purchase agreement (Pl. Ex. 8), the disclosure statement (Pl. Ex. 3), and the accounting prepared by the independent accountant (Pl. Ex. 70).

The Debtor was a Debtor-In-Possession operating the business of a hospital in DeQueen, Arkansas, from September 3, 2004, until the sale of all of the assets to DMC. JCE was, at all relevant times, the manager of the Debtor. The day-to-day operations were still handled by the employees of the Debtor but under the supervision of JCE. To make matters more complicated, John Matheson (Matheson) is the 70% owner of JCE and Vicky Kelly (Kelly) is JCE's President and CFO. (Tr. at 707 & 733.) Matheson and his wife own 80% of DMC and Matheson, Matheson's wife, and Kelly serve on DMC's board of directors. (Tr. at 733.)

The Debtor determined to sell its assets to DMC through the medium of a liquidating Chapter 11 plan. According to the petition, the Debtor owed pre-petition unsecured creditors the sum of $5,765,821.67. (Pl. Ex. 1.) There were no unsecured priority claims scheduled. (Pl. Ex. 1.) As of the date of the proposed sale, the unpaid claims included a pre-petition secured claim in favor of First National Bank of DeQueen in the sum of $998,954.35, administrative claims which included attorney's fees for counsel for the Debtor (Wetzel), counsel for the creditors

4

committee (Wright, Lyndsey & Jennings LLP), unpaid management fees due Quorum Health and/or JCE, unpaid post-petition claims of employees, unpaid wage benefit claims of employees, and unpaid claims of vendors for services or supplies incurred during the Debtor's operation while operating in Chapter 11.  (Pl. Ex. 18a & 70.)

In bankruptcy, different kinds of claims receive different treatment under a plan of reorganization and claims are paid in a priority set by bankruptcy law.[1]  For instance, the secured claim of First National Bank of DeQueen must be paid the present value of its secured claim in full.  See 11 U.S.C. § 1129(b)(2)(A)(i) and 11 U.S.C. § 506(b).  The unpaid claims for post-petition attorney's fees, management fees, post-petition wage and benefit claims, and unpaid unsecured post-petition vendor's claims are paid in full upon confirmation as administrative claims.  11 U.S.C. § 1129(a)(9)(A); 11 U.S.C. § 507(a)(1); 11 U.S.C. § 503(b)(1)(A).  Pre-petition wage claims and benefit claims are entitled to a priority status and paid up to a maximum of $4,925.00 per claim after payment of secured claims and after payment of administrative claims if any distribution is available after payment of all senior claims.  See 11 U.S.C. § 507(a)(3)(4) and 11 U.S.C. § 1129(a)(9)(B).

I.

DAMAGE FOR DELAY IN CLOSING

The Plaintiff, as stated previously, is the distribution agent created by the plan of reorganization.  He is the agent of the Debtor and his duties are set forth in the plan and they are generally to distribute the remaining assets of the Debtor in the priorities set out in the

---

[1] Because this case was filed in 2004, the applicable bankruptcy law is the 2004 Bankruptcy Code.

Bankruptcy Code.

The asset purchase agreement was between the Debtor as Seller and DMC as Buyer and it provided that the closing shall take place in Little Rock, Arkansas, at 10:00 a.m. local time, ten days after the order approving the sale is approved by the Court.  (Pl. Ex. 8, ¶ 2.1.)  The agreement also provides that the closing date may occur at such other time and place as the parties might designate in writing.  (Pl. Ex. 8, ¶ 2.1.)  The order approving the sale was entered on March 21, 2005.  (Pl. Ex. 9.)

John Matheson, the majority owner of the Defendants, testified that the delay was occasioned because his original loan was a bridge loan for just over a three-year period, and he found more desirable financing guaranteed by agencies of the United States.  The new loan was a non-recourse loan and the payments were $30,000.00 a month as opposed to $108,000.00 per month for the bridge loan.  (Tr. at 740-741.)  This took time to get approved.  Matheson said the Debtor agreed to extend the due date.  (Tr. at 741-742.)  The agreement to continue the date was also confirmed by the deposition testimony of Wetzel, counsel for the Debtor.  (Tr. at 601-603.)

Jay Bunyard (Bunyard), who was chairman of the Debtor's board of directors, explained that the closing was first held up because of a lack of approval of funding for DMC.  (Tr. at 440 & 442.)  He said the closing was first set for March 31, 2005, then reset for June 30, 2005, but funding was still not approved.  (Tr. at 448.)  Once the funding was set, it was agreed to set the closing date at September 30, 2005.  (Tr. at 442.)  In fact, there is no evidence whatsoever in the record that indicates that DMC and the Debtor did not agree to extend the date of the closing.

Bunyard testified that September 30, 2005, fell on Saturday so the closing was to take place on September 29, 2005; however, this date was not convenient to Wetzel and two members

6

of the abstract company who were involved in the closing.[2]  (Tr. at 442.)  He stated it was

therefore agreed that the signing would be "moved up one week to Friday, September 22nd with

the understanding that everything would be post-dated for a close on September 30th."  (Tr. at

442.)

Brenda Beltrani testified for the Defendants.  She was the secretary of the Board of

Directors of the Debtor at the time of the bankruptcy filing and was involved in the closing of the

sale. (Tr. at 418-419.)  She corroborated Bunyard's testimony.  She said September 29, 2005,

was scheduled as the possible closing date because it was the last work day in September, which

was the end of the Debtor's fiscal year.  (Tr. at 420-421, but see footnote 2 below.)

Wetzel testified that, "[w]e went down there on the 22nd of September to get all of the

documents executed, and my - the instructions to Standard Abstract and to Mr. Maris were to

record this effective the end of the month.  I gave those instructions and the Board gave those

instructions, and I think DeQueen Medical Center did.  Everybody was there, including Mr.

Watson from Lake Charles, who was DeQueen Medical Center's attorney."  (Def. Ex. 447 at 27-

28.)  Bunyard was present at the September 22, 2005, closing and he agreed that the Board of

Directors authorized the delay in closing.  (Tr. at 459.)

Although the asset purchase agreement provided that any change in the closing date must

be in writing, the parties chose to ignore this requirement and the change in closing was made by

both oral agreement and by email.

The Plaintiff argues that the closing of the sale should have occurred no later than April

---

[2]Actually, September 30, 2005, fell on a Friday.

1, 2005, but the actual closing date of the sale occurred on September 22, 2005, based primarily on an examination of the sale documents. (Tr. at 44.) The Plaintiff argued, in his brief, that the delay in closing constituted a breach of the asset purchase agreement by DMC and that the Plaintiff has been damaged in the sum of $1,297,119.07. (Pl. Reply Brief at 10.)

Defendants argue if a claim for damages for delay in closing existed it was extinguished when the closing occurred, and the claim for damages is an improper collateral attack on the Court's order approving the sale. (Def. Brief at 24.) Defendants also argue that any claim for damages was waived by the Debtor's delivery of the deed and acceptance of the sale proceeds. (Def. Brief at 25.)

A subsequent parol agreement can modify the terms and provisions of a prior written agreement. Linda Elenia Askew Trust v. Hopkins, 15 Ark. App. 19, 23, 688 S.W.2d 316, 318 (1985)(citing O'Bier v. Safe-Buy Real Estate Agency, Inc., 256 Ark. 574, 509 S.W.2d 292 (1974); Treat v. Safe Buy Real Estate Agency, 240 Ark. 861, 402 S.W.2d 682 (1966); Afflick v. Lambert, 187 Ark. 416, 60 S.W.2d 176 (1933)). Waiver is the voluntary abandonment or surrender by a capable person of a right he or she knows exists, with the intent that he or she shall forever be deprived of its benefits, and it may occur when one does something with full knowledge of the material facts, which is inconsistent with the right or his or her intention to rely on it. Bio-Tech Pharmacal, Inc. v. Int'l Bus. Connections, LLC., 86 Ark. App. 220, 228-229, 184 S.W.3d 447, 452 (2004)(citing Goforth v. Smith, 338 Ark. 65, 991 S.W.2d 579 (1999)). Waiver is an affirmative defense which must be affirmatively pleaded. Fed.R.Civ.P. 8(c); Barnwell & Hays, Inc. v. Sloan, 564 F.2d 254, 255 (8th Cir. 1977).

Even if the Plaintiff had a cause of action for the delay in closing, such a cause of action

8

was waived by closing the sale and receiving the sale proceeds.  No breach of the asset purchase

agreement occurred because DMC and the Debtor agreed to extend the closing date. It follows

that no damages may be recovered by the Plaintiff, who is the agent of the Debtor and who

agreed to extend the closing date in the first place.  The actual date the sale was closed is

important because at 12:01 a.m. the day following the closing, the relationship of the Defendants

and the Debtor changed, as will be discussed more fully herein.  (Pl. Ex. 8.)  The closing date

was September 30, 2005, as agreed.  The effective date of the sale was 12:01 a.m., Saturday,

October 1, 2005.


II.


<u>ACCRUED VACATION PAY, SICK LEAVE,</u>
<u>AND HOLIDAY PAY OF THE DEBTOR'S EMPLOYEES WHO</u>
<u>WERE HIRED BY DMC AFTER THE CLOSING</u>


The amended disclosure statement provides that pre-petition priority claims for vacation

pay governed by 11 U.S.C. § 507(a)(3)(A) will be assumed by the Defendants as provided in the

asset purchase agreement.  (Pl. Ex. 3, paragraph 3.04.)[3]  This liability went by several names.

The disclosure statement does not mention other pre-petition accrued employee benefits such as

sick leave and holiday pay.  The letter of intent provides that the Debtor was responsible for

payment of "accrued vacation."  (Ex. 2 of Def's Ex. 447, pg. 2.)  The plan of reorganization

describes the claims as vacation pay.  (Pl. Ex. 2., paragraph 3.04.)  The asset purchase agreement

---

[3] Interestingly, a review of the bankruptcy petition and schedules reveals that the Debtor
does not schedule any pre-petition claims for employee benefits that would be
applicable under this section.  That does not necessarily mean that such claims did
not exist.

refers to these claims as claims for vacation pay, sick leave, and holiday pay and also calls these benefits Accrued PTO.  (Pl. Ex. 8, paragraph 1.3.)   The claim is once again referred to as Accrued PTO in paragraph 1.5.  (Pl. Ex. 8.)

The plan of reorganization provides that Class IV claims (claims of employees for unpaid wages under 11 U.S.C. § 507(a)(3)(A)) will be paid up to the maximum amount allowed by 11 U.S.C. § 507(a)(3)(A) except that accrued vacation pay will be assumed by the Defendants, as provided in the asset purchase agreement.  (Pl. Ex. 2, Paragraph 3.04.)

The asset purchase agreement provides in paragraph 1.3 in relevant part,

> On and after Closing, Buyer agrees to assume . . . the following liabilities . . . Seller's obligations as of the Closing Date with regard to accrued vacation pay, sick leave, and holiday pay of Seller's employees at the Facility who are hired by Buyer as of the Closing Date (the "Accrued PTO"), as set forth on Schedule 1.3 but only to the extent of a maximum of $4,650.00 per person. . . .[4]

Section 1.4 of the asset purchase agreement provides,

> Except as expressly provided to the contrary in Section 1.3 above, Seller shall retain, and under no circumstances shall Buyer be obligated to pay or assume . . . without limitation, the following . . . (i) current liabilities (including accounts payable) of Seller and any other indebtedness, obligations, or guarantees of Seller . . . all as set forth in the Financial Statement of the seller or seller's bankruptcy schedules. . . .

Section 1.5 of the asset purchase agreement provides,

> Purchase Price. At Closing, Seller shall reimburse Buyer for Accrued PTO.  If Seller does not reimburse Buyer such sums at Closing, Buyer may reduce the Purchase Price in an amount equal to such Accrued PTO as has been assumed by

---

[4] In 2005, the maximum amount of such a priority claim was $4,925.00.  These amounts are adjusted for inflation pursuant to 11 U.S.C. § 104(b)(1).

Buyer.

(Pl. Ex. 8.)

After the sale closed, JCE, as manager of the Debtor, paid from the sale proceeds a sum

in the amount of $68,000.00 to employees for accrued sick pay, vacation pay, and holiday pay,

plus taxes due on these benefits as an administrative expense.  (Tr. at 672.)  Wetzel instructed an

employee of the Debtor, Lorie Jones (Jones), by email as follows:

> Dear Lorie,
>
> I do not know what the Board's policy is on sick leave.  The amount payable is
> limited to $4,925.00 per employee no matter if it is vacation pay, sick leave or
> holiday pay for all amounts as of 09/30/04 [the petition date].  After that date the
> sick leave, vacation pay and holiday pay became an administrative claim with no
> limit.   Only those amounts that are due payable for sick leave, vacation pay and
> holiday pay should be paid at closing from the sale proceeds.  The accrued
> amounts are being assumed by JCE as I read the sale contract.
>
> Sincerely,  Tripp Wetzel

(Tr. at 625 & Def. Ex. 446.)

The asset purchase agreement states emphatically that DMC does not assume any of the

Debtor's liability; however, in the preceding paragraph DMC agrees to assume the accrued

vacation pay, sick leave, and holiday pay of the Debtor's employees to the extent of $4650.00

per employee. Later the agreement states that DMC is to be entitled to be reimbursed by the

Debtor by way of a price reduction if DMC has paid the employee benefits now referred to as the

PTO.  (Pl. Ex. 8.)  Jones testified that the Debtor owed $29,581.01, which she described as,

"vacation that was accrued and on the books 90 days prior to bankruptcy."  (Tr. at 617-618.)

The record was reopened to allow the parties to introduce schedule 1.3 to the asset purchase

agreement.  This schedule is governed by paragraph 1.3, 1.4, and 1.5 of the asset purchase

11

agreement. Paragraph 1.5(ii) requires the Debtor to reimburse DMC if DMC pays any of the scheduled liabilities on schedule 1.3 to paragraph 1.3 of the exhibit. Therefore, since the Debtor is ultimately responsible to pay, the Plaintiff is not entitled to judgment against the Defendants under this paragraph.

The payment of $68,000.00 made by JCE on behalf of the Debtor, with the Debtor's money, was authorized by the asset purchase agreement and the confirmed plan, because these expenses were administrative expenses, which according to the plan and the Bankruptcy Code are required to be paid in full. See Pl. Ex. 2, paragraph 3.01; 11 U.S.C. § 507(a)(2); 11 U.S.C. § 1129(a)(9)(A)(administrative expenses shall be paid in full in the ordinary course of business). The money paid was for vacation that was on the books from September 5th to the September 30th closing date. (Tr. at 619.) The claims that the asset purchase agreement is referring to and the parties are arguing about are those pre-petition, unpaid wage benefit claims of employees governed by 11 U.S.C. § 507(a)(3)(A) which were put in Class IV of the plan. Paragraph 3.04 provides that wage claims will be paid the maximum permitted by 11 U.S.C. § 507(a)(3)(A) and vacation pay is assumed by DMC as provided by the asset purchase agreement which, of course, puts the ultimate liability back on the Debtor in paragraph 1.5 of the asset purchase agreement. If any Class IV claims exist, they will be paid by the Plaintiff from the funds on hand. The Plaintiff, therefore, is not entitled to a judgment for paid employee wage claims in the amount of $68,000.00 because they were administrative claims that were the responsibility of the Debtor according to the plan. Nowhere in the asset purchase agreement does DMC assume payment of the Debtor's accrued administrative claims for wage benefits.

III.

12

THE ACCOUNTS PAYABLE POST-PETITION

A. THE PAYMENT OF ADMINISTRATIVE ACCOUNTS PAYABLE FROM THE PROCEEDS OF THE SALE

The parties are in disagreement over the liability for the unpaid accounts payable left over from the hospital's operation in Chapter 11. The order approving the sale (Pl. Ex. 9), the plan (Pl. Ex. 2), and the asset purchase agreement (Pl. Ex. 8) all address this issue.

The order approving the sale directed how the Debtor's proceeds were to be disbursed. (Pl. Ex. 9.) First, the proceeds were to be deposited into the Debtor's DIP account in DeQueen, Arkansas. Second, closing costs estimated to be $5,900.00 were to be paid. Third, the secured claim of First National Bank was to be paid. Fourth, management fees, if any, due JCE were to be paid. Fifth, pro-rated amounts such as taxes and utilities were to be paid. Sixth, the final payroll was to be paid. (Pl. Ex. 9.) Nothing in the order approving the sale addressed payment of any other unpaid administrative expenses including accounts payable and attorney's fees by the closing agent. However, the parties marched to their own drummer.

First, the sale proceeds were paid to Standard Abstract & Title Company of Little Rock and not to the Debtor. Second, the closing costs were $15,642.50, three times the amount estimated, and they were paid by the title company. (Pl. Ex. 18.) Third, the title company also paid directly from the sale proceeds the following:

| | | |
|---|---|---|
| (a) | Attorney's fees for Frederick Wetzel: | $ 27,683.63 |
| (b) | Attorney's fees for the Wright Firm: | $ 38,411.91 |
| (c) | Quorum Health: | $124,825.81 |
| | (TOTAL) | $190,921.35 |

13

The secured claim of First National Bank of DeQueen was paid the sum of $1,089,465.08 on September 29, 2005.  (Pl. Ex. 18d.)  The remaining balance of $2,103,435.09 was transferred by the title company to the Debtor's  Account No. 66134, which was managed by JCE, on September 29, 2005.  (Pl. Ex. 70, schedule 1-A & Pl. Ex. 18.)

According to Schedule I of the accountant's report, cash on hand as of September 29, 2005, in four separate accounts maintained by JCE for the Debtor, totaled $116,959.68.  This cash on hand combined with the $100,000.00 deposit, the sale proceeds of $2,103,435.09, and miscellaneous deposits from other sources gave the Debtor as of September 29, 2005, the total cash sum of $2,508,782.53.  (Pl. Ex. 70, schedule 1.)

The closing cost of $15,642.25 and deduction for attorney's fees and administrative claims of Quorum Health totaled $206,563.60.  The plan estimated that cash on hand on the date of closing would be approximately $390,000.00.  (Pl. Ex. 2, paragraph 7.02.)  The actual cash on hand on September 29, 2005, was $116,959.68.  (Pl. Ex. 70, schedule 1.)  The plan estimates that after deductions the Debtor could have $3,844,100.00, before the cost of administration and payment to secured creditors.  (Pl. Ex. 2, § IX.)  However, according to schedule 1 of the accountant's report, the Debtor had $2,508,782.53 on hand, and most of the administrative claims from the pre-sale operation of the hospital had not been paid, including the $342,761.00 premium for tail insurance coverage authorized by the Court.

The order approving the sale provided that "[t]he balance of the funds shall be held in the Debtor's bank account for payment of its claims in accordance with the confirmed Plan."  (Pl. Ex. 9, ¶ 5.)

The plan  provides:

      7.01.   Funding of the Plan:  No later than the Effective Date as of the date of sale to JCE Health, Inc., whichever is later, the Debtor shall convey, transfer, assign and deliver substantially all of its cash to the Distribution Agent for the Initial Distribution, pursuant to the terms of the Plan.  The Distribution Agent shall make pro rata distribution of the available cash to the Unsecured Creditors as set forth in the Plan.

      7.02    Initial Distribution: Current liquid assets of the estate consist of approximately $390,000.00 cash and other small cash items.  The sale to JCE Health, Inc. should result in net proceeds available to fund the plan of approximately $3,494,100.00, less actual closing costs.  The amount left after deducting administrative expenses and the escrow set out in paragraph 6.04 will be distributed in the Initial Distribution.

      7.03    Final Distribution: The remaining money in the Debtor's estate, together with the collection of possible preferences, insurance premium rebates and other small miscellaneous items will constitute the cash for the Final Distribution, which will be made no later than sixty (60) days after all sums are collected.

(Pl. Ex. 2.)

      The burden to make distribution to pay final bills fell on the Debtor's employees. The Plaintiff testified that on the effective date of the closing, JCE was contractually obligated by the management agreement to physically disburse the money and pay the accounts payable.  (Tr. at 114.)  He said JCE understood it was to pay the accounts payable and that at that time JCE had exclusive control of the money.  (Tr. at 114-115.)  These employees were originally employees of the Debtor, then employees of JCE, and then employees of DMC once the sale closed.  The management agreement terminated when the sale closed. (Pl. Ex. 5, Article II.)  Advice to these employees came mostly from the Debtor's attorney, Wetzel.  In general, they were instructed by Wetzel to pay the final bills as of September 30, 2005, and after that, pay the Plaintiff the remaining balance.  This procedure was communicated to Ike Scott (Scott), the attorney for the creditor's committee by letter from Wetzel,  and the record did not indicate any disagreement

with this procedure.   (Ex. 10 of Def. Ex. 447.)

The Plaintiff seeks judgment against the Defendants under three principal theories.  First, judgment is sought for all amounts paid from the sale proceeds on the unpaid administrative accounts payable on the basis that these payments were not authorized by the asset purchase agreement.  The second theory is that some payments were to vendors who sold supplies and services that solely benefitted DMC or were for post-sale expenses.  The Plaintiff's third argument is that payments to vendors who performed services or sold supplies to the Debtor pre-closing and post-petition but who did not send the Debtor an invoice prior to closing were also assumed by DMC.  The legal theory is that these payments constituted breach of the asset sale agreement.  (See, generally, Pl.'s Post-Trial Brief.)

The Plaintiff's complaint alleges as to post-petition vendor payments in part as follows:

Except as otherwise specifically identified in the Agreement, JCEHG/DMC did not assume Debtor's current liabilities including accounts payable.

Although JCEHG/DMC did not assume Debtor's accounts payable they continued, after the Closing Date, to exercise control over Debtor's funds and pay expenses from Debtor's checking accounts at First National Bank of DeQueen including payment of Debtor's pre-closing accounts payable.

In addition to paying Debtor's pre-closing accounts payable, JCEHG/DMC used Debtor's funds, over which they exercised exclusive control, to pay "post-closing" accounts payable which were the sole obligation of JCEHG/DMC.

(Pl. Complaint at 24-26.)

Scott, in his opening statement, when speaking of the accounts payable stated, "[a]nd the accounts payment [sic] due at closing were to be paid by the debtor hospital."  (Tr. at 13.) Plaintiff, when testifying about his understanding of the agreement, stated that, "[i]t's my

understanding that the accounts receivable, as of the closing date, would be owned by the buyer, JCE or its designee in this case, and the accounts payable would be owned by the Debtor."  (Tr. at 54 .)  The Plaintiff stated upon further questioning that there was never any contention that DMC would assume trade accounts payable of the Debtor.  (Tr. at 284.)

Notwithstanding the complaint, opening statement, and testimony of the Plaintiff, Plaintiff now argues in his brief that under the asset purchase agreement DMC assumed all of the Debtor's post-petition current liabilities and accounts payable.  (Pl. Reply Brief at 5.)

This argument is based on the Plaintiff's interpretation of paragraph 1.4 of the asset purchase agreement.  The relevant portion of the paragraph as argued by the Plaintiff is as follows:

> Excluded Liabilities.  Seller shall retain, and under no circumstances shall Buyer be obligated to pay or assume, and none of the Assets shall be or become subject to, any liability of Seller including, without limitation, the following, whether fixed or contingent, recorded or unrecorded, known or unknown (collectively, the "Excluded Liabilities"); (i) current liabilities (including accounts payable) of Seller and any other indebtedness, obligation or guarantee of seller, including, without limitation, long term indebtedness (and the current portion thereof), all as set forth in the Financial Statements of Seller or Seller's Bankruptcy Schedules . . . .

(Pl. Ex. 8, paragraph 1.4)(Emphasis added.)

The Plaintiff argues that since liabilities listed on financial statements and the bankruptcy schedules would exclude current accounts payable incurred during the operation of the bankruptcy case [administrative expense], paragraph 1.4 only excludes pre-petition liabilities and not post-petition current liabilities.  Therefore, paragraph 1.4 is an affirmation of DMC's assumption of the Debtor's administrative accounts payable.  (Pl. Brief at 8 & Pl. Reply Brief at 5.)

17

The meaning of this sentence turns on whether the phrase "all as set forth" refers to the preceding phrase "and any other indebtedness, obligation or guarantee" or whether "all as set forth" refers to the entire phrase beginning "(i) current liabilities."

Plaintiff's argument stretches the meaning of this provision of the asset purchase agreement beyond all common sense, and it is not supported by any other evidence in the record, including his complaint, his counsel's opening statement, or the testimony of the Plaintiff himself.  Also, nowhere in the plan, disclosure statement, letter of intent, order approving sale, or asset purchase agreement is it specifically stated that DMC will assume all of the Debtor's administrative claim accounts payable.  The Court has to assume that, with as many lawyers as were involved in this case, if it had been the intention of the parties that DMC was assuming all unpaid administrative accounts payable, someone would have composed a sentence to convey the meaning the Plaintiff urges.  As stated by Chief Justice McCulloch in the case of Grayson-McLeod Lumber Co. v. Slack-Kress Tie & Stave Co., "if the effect contended for now was intended by the parties, different language, more appropriate to convey that meaning, would have been employed."  102 Ark. 79, 143 S.W. 581, 582 (1912).

The Plaintiff's claim that the Defendants breached the asset purchase agreement by paying the administrative accounts payable from the proceeds of the sale is not sustained by the evidence.

B.  USE OF THE SALE PROCEEDS TO PAY OBLIGATIONS OF DMC

The Defendants concede that some payments were mistakenly made from the Debtor's funds  and that the money should be repaid to the Plaintiff.  The following is a list of the items that the Defendants concede:

18

| Invoice | Payee | Amount of payment |
|---------|-------|-------------------|
| 6/16/05 | Stuck Associates | $28,365.05 |
| 8/31/05 | Stuck Associates | $ 1,115.28 |
| 9/08/05 | Shur Copi | $      40.74 |
| 9/10/05 | Contemporary Concepts | $     881.64 |
| 9/27/05 | AirGas | $     100.00 |
| 10/14/05 | Stuck Associates | $ 6,000.00 |
| 10/11/05 | Plunkett Drugs | $     932.50 |
| 10/14/05 | Shur-Copi | $      90.00 |
|  | Total | $ 37,525.21 |

(Def.'s Post Trial Brief at 19-23.)

In addition, Plaintiff's Exhibit 49 contains a list of payments Plaintiff contends were improperly made.  The Court has carefully reviewed the list and the supporting invoices at Plaintiff's Exhibit 43 and concluded that the following are additional payments that should be refunded to the Plaintiff:

1. Exhibit 43H: an invoice in the amount of  $1,011.50 dated 9/21/05 for 289 "New Dad" hats printed with DMC's logo.  The expense did not  benefit  the Debtor.

2. Exhibit 43M: The assessment of an IRS penalty in the sum of $3967.72 for late payment of taxes by JCE,  which was a breach of the management agreement,  Article III, Paragraph 5.

3.  Exhibit 43Q:   An $80.00 payment to Enlace Latino, a  newspaper,  dated after September 30, 2005.

4.  Exhibit 43Y: An invoice dated 10/07/05 for an October 1, 2005, deposit to Select Data Services for $263.07.  This is a post-closing bill and should be paid by DMC.

5.  Exhibit 43Z: a statement for annual dues to the Arkansas Hospital Association for 2005 for $2,740.00.  This payment should be pro-rated for the months of October, November, and December in the sum of $855.00.

6.  Exhibit 43AA: A travel and expense report that includes expenses of $51.00 incurred after September 30, 2005.

7.  Exhibit 43GG: An invoice dated 10/10/05 from American Solutions for Business for $299.00 for 1000 English and Spanish brochures.  The date on the invoice does not  match the shipping date of 8/24/05, and the items were purchased for the benefit of DMC and were not typical hospital inventory.

8. Exhibit 43LL: Invoices from Bunyard Broadcast for radio advertisements broadcast throughout September 2005 for a total charge of $610.00. The services  were performed before the closing date, but the advertisements promoted DMC. Therefore,  DMC should pay the invoice of $610.00 because the expense benefitted DMC.

9.Exhibit 43ZZ:   An invoice for $1,286.55  from Joanie's Flowers & Gifts for gifts and floral arrangements delivered form August 1 to September 30, 2005.  This expense was not incurred for maintaining typical hospital inventory and includes a birthday gift as well as arrangements for ill patients and various "miscellaneous" purposes.   Furthermore, this

expenditure did not  benefit  the Debtor.

10.   Exhibit 43KKK: A UPS invoice for $102.55.  The services were performed after September 30, 2009.

11.   Exhibit 43PPP:  A check request for $370.88 for  Lynnette Boyd for landscaping and specifically for lawn ornaments, bench and chairs, flowers, plants, potting soil, etc. The invoice date is either 9/31/05 or 7/31/05.  This expense should be DMC's charge because, regardless of the date incurred,  it was  not for the purchase of  hospital inventory  and benefitted DMC.

The other objections by the Plaintiff set out in Plaintiff's Exhibits 43 and 49 are overruled.  The Court has reviewed each of the invoices introduced into evidence.  Many objections are based on Plaintiff's assumption that the sale closed September 22, 2005.  Some items of inventory were bought on the very last day prior to closing, but JCE was obligated to maintain normal inventory levels, and the record does not reflect that these purchases were not made pursuant to that obligation.

The accountant's report in Schedule 1 provides that JCE (or some other entity) still holds $15,360.83 of the Debtor's money, and this sum should be turned over to the Plaintiff.  Also a payment of $1,633.30 to the IRS was identified as a penalty for late payment of taxes.  This amount should also be refunded to the Plaintiff as damages for breach of the management agreement. (See Accounting, Schedule A at 12 and supporting documentation.)  Similarly, JCE breached the management agreement by incurring a tax penalty of $613.21, which it paid to the Arkansas Department of Finance and Administration on January 31, 2006 from the Debtor's

funds. (See Pl.'s Ex. 70,  Schedule A at 13 and supporting documents in Volume 5**,** tab 1/31/2006.)

Therefore, the Plaintiff is entitled to recover from the Defendants jointly and severally under this section the total sum of $64,029.82.


IV.

<u>PATIENT REFUNDS</u>

Schedule E of the Accounting  lists eleven pages of patients who received refunds from JCE from the proceeds of the sale.  These payments total $61,736.05.  (Accounting at Schedule 1, Checks written for Refunds.) Schedule E records the amount of the refund and three dates: when the service was performed by the hospital, when the patient paid the hospital, and when the refund check to the patient was issued by JCE from the Debtor's account.

Patient refunds are not mentioned by that name in the plan, the disclosure statement, or the asset purchase agreement.  The refunds could constitute pre-petition accounts payable and, depending on the date the right to refund accrued, they could constitute post-petition administrative claim accounts payable.

 The petition date was September 3, 2004.  (Pl.'s Ex. 1.)  The refund checks were issued between the dates of October 3, 2005, and August 29, 2006, from Account Number 66134 at the First National Bank of DeQueen, which is the account into which the sale proceeds were deposited on September 29, 2005.  (Pl.'s Ex. 70, Schedule A.)  A number of the payments made by patients that  entitled the patients to refunds were made  before the petition date of September

22

3, 2004.[5]  These total $2,370.65 and constitute pre-petition claims that should not have been paid as administrative claims.

Also, patient refunds totaling $8329.23 were for payments made by  patients to DMC after September 30, 2005, and constituted a post-sale accounts payable owned by DMC.  These

---

[5]  The following refundable payments were made by patients prepetition:  $27.70, 4/6/2004; $465.60,  8/16/2004; $155.80, 2/19/2004; $20.00, 3/4/2004; $20.00, 7/27/2004; $432.55, 3/12/2004; $80.00, 3/5/2004; $41.82, 7/1/2004; $107.70, 6/11/2004; $34.43, 11/13/2001; $75.88, 3/23/2000; $29.39, 7/23/2004; $31.07, 12/5/2002; $134.07, 11/18/2002; $54.27, 2/19/2004; $36.00, 3/5/2004; $80.85, 11/1/2001; $24.05, 1/24/2000;$96.80, 9/2/2004; $27.60, 1/27/2000; $21.00, 12/22/2003; $27.70, 12/18/2003; $49.65, 12/1/2003; $74.62, 9/1/2004; $54.27, 9/1/2004; $77.44, 8/30/2004; $68.00, 4/4/2004; $22.39, 5/8/2004.

refunds should not have been made with the Debtor's money.[6]

In their brief, the Defendants concede they owe $7741.12 of the post-sale patient payments that were refunded to the patients from the Debtor's funds. However, as to the pre-petition claims totaling $2370.65, JCE argues it had no responsibility to not pay pre-petition claims. Contrary to the Defendants' argument, the management agreement provides that JCE is not to pay pre-petition claims, as the Plaintiff points out in his brief. (Pl. Ex. 5, Art. III, 6.) JCE breached the management agreement in this regard, and the Plaintiff is entitled to judgment against the Defendants in the sum of $2370.65 and $8329.23, for a total of $10,699.88.

V.

POST-CLOSING PAYMENT TO CPSI

The Plaintiff also complains that a payment from the Debtor's funds to CPSI for $24,000.00 was not for the benefit of the Debtor. (See Pl.'s Ex. 43SSS, Invoice from CPSI dated 10/05/05.) The Accounting reflects that Check Number 3595 payable to CPSI in the sum of $24,000.00 cleared the Debtor's account (Account Number 66134) on November 21, 2005. (Independent Accountants' Report, Schedule A at 10.)

Vicky Kelly, an employee of JCE, testified regarding this issue. She stated CPSI

---

[6] The following refundable payments were made by patients after the sale closed on September 30, 2005: $41.82, 10/3/2005; $368.62, 10/14/2005; $20.00, 10/10/2005; $386.08, 10/31/2005; $83.53, 11/4/2005; $120.00, 12/22/2005; $773.76, 10/5/2005; $59.33, 11/11/2005; $300.00, 10/14/2005; $45.15, 10/31/2005; $768.60, 11/8/2005; $645.33, 10/21/2005; $115.80, 12/5/2005; $166.46, 10/14/2005; $876.00, 11/2/2005; $324.13, 10/18/2005; $336.70, 1/2/2006; $7.83, 10/3/2005; $66.00, 11/7/2005; $49.90, 10/31/2005; $325.88, 12/5/2005; $27.70, 10/31/2005; $112.79, 3/28/2005; $27.70, 10/31/2005; $351.60, 10/17/2005; $194.40, 1/9/2006; $1045.42, 11/7/2005; $197.68, 10/3/2005; $97.31, 3/22/2006; $162.00, 10/10/2005; $70.00, 10/31/2005; $93.35, 10/4/2005; $68.36, 10/19/2005.

performed services and maintained computer hardware and software used by the hospital for the accounting system.  She claimed that as part of the asset purchase agreement, DMC was purchasing all of the computers and the accounting system.  For that reason, it was necessary to create a "mirror image" of the accounting records  for the Debtor to use because after  the sale the Debtor would have no system in place to pay the final bills and perform an accounting, make payroll, prepare final tax reports and returns, and prepare the final cost report.  (Tr. at 710-711.) Kelly stated this computer issue was addressed  at the board meeting of the Debtor.  In response to the Defendants' attorney's questions, she testified,

> A.   That was brought up in a board meeting that we had with the seller -- with the seller's board, DeQueen Regional.  And it was discussed about - - we explained to them why they needed the mirror image, because once they closed they wouldn't have access to their information if they didn't have it.  And, but we also told them, at the time, if they wanted to pay for the mirror image and all that it entailed, that we would go ahead and run their W-2s for them, run their final payroll, run their checks, you know, those kind of things, and be there on hand to help them if they hired a - - they'll have to hire a CPA to do their final audit and they'd have to hire somebody to do their cost report, but we would be available to help them gather the information.  The new company, the buyer, would be available to help them, you know, through the process, because we're very familiar with the system.

> Q.     Is that how the new company was compensated?

> A.     Exactly.  That's what the board decided to do.

> Q.     So - -

> A.     They wouldn't have - - that way, they wouldn't have to hire somebody to come in and do all those things.  And we just told them that we would do it for them.

> THE COURT:   You're talking about the seller's board?

25

THE WITNESS:    The seller's board wouldn't have to.  The buyer would do it for the seller's board.

(Tr. at 712.)

The Debtor's board of directors approved the purchase of the CPSI software in exchange for an agreement with  JCE to complete the Debtor's end-of-year records without charging the Debtor a fee for those services.  (Pl.'s Ex. 60, Board of Directors Minutes, August 24, 2005.) Brenda Beltrani, a member of the Debtor's board of directors, also confirmed this agreement, stating that,  "I think we approved the expenditure of it in our board meeting.  I think it was paid for by the -- by the old hospital [the Debtor]."  (Tr.at 436.)

The evidence demonstrates that the parties orally agreed that, in connection with the asset purchase agreement, the mirror image equipment and software would be purchased. Therefore, no breach of an agreement has occurred.  Both parties to the agreement performed their agreement, and certainly the agent of the party agreeing to purchase the computer equipment with its money has no cause of action against the other party to the agreement.

VI.

<u>INSURANCE REFUNDS</u>

The parties agreed that the Debtor was to retain all unpaid insurance premium refunds after the sale closed.  (Pl. Ex. 8, Asset Purchase Agreement, ¶ 1.1 (v).)  In the same sentence, the asset purchase agreement states that DMC was to receive all assumable prepaid expenses and claims for refunds.  Thus, the Debtor retained the prepaid insurance refunds while DMC received all other entitlements to refund.

26

The Plaintiff claims in his brief that he should recover refunds from three policies:  a general liability insurance policy (Pl. Ex. 51), a directors and officers liability policy (Pl. Ex. 50), and an umbrella policy (Pl. Ex. 52).  The Plaintiff also seeks a refund from the workers compensation policy.

A.      WORKERS COMPENSATION REFUND

DMC admitted at trial and in its brief that in January 2006, it received a $24,310.00 refund from a workers compensation policy and that the Plaintiff is entitled to recover this amount.  The refund was paid directly into  DMC's account where, because of a bookkeeping error, it apparently remains. (Tr. at 560-61.) The Defendants do not dispute that they are in possession of the funds and that the Plaintiff is entitled to the money. (Def's Post-Trial Brief at 28.)

The Defendants ask the Court to offset  the workers compensation refund  against Medicare/Medicaid proceeds of $25,017.74 that the Defendants allege is being  improperly retained by the Debtor.  This argument will be addressed at Section VII below.

B.      ALL OTHER INSURANCE

Schedule 2 of the Accounting indicates that the sum of $49,981.11 was deposited to the Debtor's bank account number 84786 and was identified as a deposit from Imperial.  Imperial was a finance company for the insurance policy.  (Tr. at 308.)  This sum was used to purchase a cashier's check which was written to the Plaintiff.  (Pl. Ex. 27.)

The Plaintiff does not dispute the receipt of the check.  (Tr. at 86 & 305.)  However, the Plaintiff argued that  more refunds are due because "[t]he total premium paid for the directors

27

and officers, general liability, and umbrella policies was $291, 209.13.  The policies were for a

calendar year and at the time of sale  had three months of insurance coverage remaining on each

policy. . . .   If the insurance policies were prorated through the calendar year then this would

result in  unearned premiums for one-fourth of the year or $72,802.28 [rather than the

$49,981.11 paid to Plaintiff]. . . ."  (Pl. Post Trial Brief at 19.)

However, Mandy Hooker, an employee at the hospital, explained,

A.      It is my understanding that the policies in effect at the date of closing were
the general property insurance, general liability, excess liability.

Q.      And that would be the umbrella policy?

A.      Umbrella policy.  Workman's Comp.   And there was an endorsement to
the professional liability, which included D&O coverage.
. . .
Q.      So you had, as far as you know, five policies; is that correct?

A.      The D&O coverage was an endorsement to the professional liability, so it
was actually just four policies, is my understanding.


. . .


Q.      And the first three policies, namely the - - what I refer to as malpractice
insurance - - the umbrella policy, and the D&O policy, were separately financed;
is that right?

A.      It was four policies.  It was the property, the umbrella, the malpractice
with the D&O.  Those were the policies that were financed together.

Q.      And all of those three policies were on a calendar year basis; were they not?

A.      The finance agreement was for a year's premium, paid out over nine months.

28

Q.     And the policy - - but the policy period was for 2005, the entire year?

A.     Yes, sir.

Q.     Okay.  So we would be entitled to a refund of those premiums for three months - - the remaining three months on the policy?

A.     That's - - that's not something that I could attest to, sir.

(Tr. at 581 - 583.)

The Court is unable to find any other evidence in the record on this issue.  The Plaintiff has not carried its burden of proof to show that more insurance refunds have been received by the Defendants or that refunds are due from any third party.  The $49,981.11 payment from Imperial and the worker's compensation refund of $24,310.00 are all of the refunds the evidence shows were received.  No witness from the insurance company in question was called to testify about how a refund is calculated; that is, whether it is prorated, front-loaded, or back-loaded. (See Pl. Ex. 21, Endorsement No. 3, discussing cancellation and retention of minimum of earned premiums.)  Therefore, the Plaintiff is entitled to recover the sum of $49,981.11 and the sum of $24,310.00 for prepaid insurance premiums.  The Defendants are credited with having already paid the sum of $49,981.11.

VII.

FUNDS DEPOSITED INTO BUYER'S ACCOUNT POST CLOSING

The Defendants assert that the sum of $25,017.74 deposited in the Debtor's accounts payables bank account, Number 84786,  on October 4, 2005, is a post-closing accounts

29

receivable from Medicare that the Debtor has improperly retained.  (See Pl.'s Ex. 70 at

Summary-Schedule 1; Schedule B-Account #84786, Deposit 10/04/05 $25,017.74.)   The

documentary evidence indicates that after the Debtor received the funds, they were "swept" into

the Debtor's DIP account Number 66134 on November 23, 2005, as part of a $56,529.21

disbursement. (Pl. Ex. 70 at Schedule B at 3.)

         The Defendants assert that, as an accounts receivable, this payment was sold to  DMC,

and they seek to offset this sum against the money they concede they owe the Plaintiff for the

workers compensation insurance refund.  (Def's Post-Trial Brief at 28, 31.)

         According to the asset purchase agreement, all accounts receivable as of 12:01 a.m.

October 1, 2005, became property of DMC. (Pl. Ex. 8, ¶ 1.1(i).)   However, the Plaintiff argues

that under the asset purchase agreement, Medicare reimbursements were specifically excluded

from the accounts receivable sold to the Defendants. The asset purchase agreement recites that

"the rights to settlement and retroactive adjustments . . . for open cost reporting periods ending

on or prior to the Closing Date (whether open or closed) arising from or against the United States

government under the terms of the Medicare program or CHAMPUS, [or] any state under its

Medicaid program . . ." are to be retained by the Debtor. (Pl. Ex. 8 at ¶ 1.2(ii).)

         There is very little evidence in the record as to what this payment represents.   The

Plaintiff testified that he hired Patty Justice, a CPA in New Orleans, to prepare the Medicare cost

report. (Tr. at 73.)  Ms. Justice negotiated the adjustments with Medicare because the Plaintiff

stated he simply lacked the expertise to do the calculations.  (Tr. at 75.)   Plaintiff's Exhibit 23

includes Ms. Justice's deposition and accompanying exhibits.  Exhibit 8 to Plaintiff's Exhibit 23

is a letter from Ms. Justice to Ms. Lorie Thompson dated March 8, 2006, in which Ms. Justice

30

refers to an anticipated $500,000.00 receivable from Medicare and Medicaid.  (See also Exhibit 11 to the deposition.)

The Plaintiff testified that he had no complaint about the report. (Tr. at 77.)  Paragraph 3.02 of the plan deals with claims of Medicare/Medicaid against the Debtor for prior year overpayment.  (Pl. Ex. 2.)   The plan proposes to set off the adjustment due to the Debtor as disclosed in Ms. Justice's report against the pre-petition overpayment.

 Ms. Hooker testified that the account into which the payment was deposited was a depository account that received electronic funds transfers from such sources as Medicare.  She stated that the funds came from the V.A. (Tr. at 558.)  She testified with regard to Plaintiff's Exhibit 25, which was an attempt at an accounting covering the period from October 1, 2005 to August of 2006 and prepared for the Plaintiff by the new hospital employees.   The Exhibit contains this  entry, "New Co. 1st Deposit."  Ms. Hooker's testimony appears to conflict with the accounting's identification of Medicare as the source of the funds. (Compare Tr. at 558 with Pl. Ex. 70, Schedule 1 & Schedule B.)

The Court does not credit Ms. Hooker's testimony, which was based on her memory of an accounting prepared at least two years prior to the hearing date.  The fact that the Medicare payment was received by the Debtor only four days after the closing of the sale supports an inference that the right to payment accrued during a cost period that ended prior to closing.  As such, the payment was excluded by the APA from the accounts receivable that were sold to the new hospital.  Therefore,  the Defendants may not offset the  sum of $25,017.74 against the

judgment rendered hereinafter against them. [7]

VIII.

<u>INTEREST</u>

In his post-trial brief, the Plaintiff argues that JCE failed to invest the sale proceeds into an interest bearing account and claims lost interest damage as follows:

a.      Interest on $892,736.34 from the date of closing (September 30, 2005) until December 15, 2005, the date the funds were transferred to the distribution agent, calculated at 2%, which totals $3473.34.

b.      Interest on the insurance refund of $49,981.11 from February 8, 2006, when it was

received by the Debtor's accounts payable account  to June 15, 2006, the date it was transferred to the Plaintiff, all at the rate of 4.41% in the sum of $682.39.   The Plaintiff also requests interest on the workers  compensation insurance refund of $24,310.00 that the Defendants received January 2006 and  currently hold.

c.      Interest on vacation, sick and holiday pay that was allegedly improperly paid to

---

[7]In his Reply Brief, the Plaintiff also argues  that a total of $23,280.68 received post-petition by the Debtor was erroneously transferred to an account belonging to the Defendants, despite the fact that the APA provided that the Defendants did not purchase the rights to Medicare/Medicaid settlements and retroactive adjustments for periods ending  prior to the closing date. (Pl.'s Reply Brief at 13-14.)  Although the $23,280.68 was the sum of 13 separate deposits emanating from the Debtor's bank account to an account owned by the Defendants,  the individual deposits are not identified as being for Medicare/Medicaid or CHAMPUS reimbursement.  (Pl.'s Ex. 70, Schedule 1, Disbursements, Payment to Buyer acct # 902349.) (See also Pl.'s Ex. 70 at Schedule 2. ) The Court can find no evidence in the record that these were Medicare/Medicaid payments wrongfully credited to the Defendants.

the employees in the sum of $9611.22.  (Tr. at 391.)  (Pl. Ex. 47-D.)

      d.      Interest on all other funds found to have been paid improperly by the Defendants

computed at the rate of 4.41% per annum calculated from the date the Plaintiff alleges the sale

should have closed to the date of the judgment.

      e.      Post-judgment interest on the entire amount of the judgment at the statutory rate.

      Under a choice of law provision, the Asset Purchase Agreement states that Arkansas law

will govern the agreement.  Pursuant to  applicable case  law in Arkansas, prejudgment interest

compensates the plaintiff for "recoverable damages wrongfully withheld from the time of the

loss until the judgment."  TB of Blytheville, Inc. v. Little Rock Sign & Emblem, Inc., 328 Ark.

688, 697, 946 S.W.2d 930, 934 (1997).

      A court may only award prejudgment interest if  "the amount of the damages is definitely

ascertainable by mathematical computation, or if the evidence furnishes data that make it

possible to compute the amount without reliance on opinion or discretion." Ray & Sons Masonry

Contractors, Inc. v. U.S. Fidelity & Guar. Co., 353 Ark. 201, 223-24, 114 S.W.3d 189, 203

(2003) (citing  Woodline Motor Freight, Inc. v. Troutman Oil Co., 327 Ark. 448, 453,  938

S.W.2d 565, 568 (1997)).

      Before prejudgment interest is awarded, the amount of damages must be capable of exact

determination "both in time and amount." Woodline Motor Freight, 327 Ark. at 451, 938

S.W.2d. at 567. See also Pro-Comp. Management, Inc. v. R.K. Enters, LLC, 372 Ark. 190, 194,

272 S.W. 3d 91, 95 (2008);  Ray & Sons Masonry Contractors, Inc., 353 Ark. 201, 224, 114

S.W.3d 189, 203.   If the amount of damages is capable of determination in both time and

amount, "the injured party is always entitled to [prejudgment interest] as a matter of law." Wooten v. McClendon, 272 Ark. 61, 62, 612 S.W.2d 105, 106 (1981).

Prejudgment interest may be calculated for multiple occurrences of failure to pay under a contract; that is, interest may be calculated on each instance of non-payment when payment was due under an agreement. All-Ways Logistics, Inc v. USA Truck, Inc., No. 08-1054, 2009 WL 3126561, at * 7, (8th Cir. Oct. 1, 2009) (construing Arkansas law) (citing Reynolds Health Care Services, Inc. v. HMNH, Inc., 364 Ark. 168, 217 S.W.3d 797, 807 (Ark. 2005)).

Arkansas  law dictates that when interest has not been agreed upon under the contract or set by statute, the rate of prejudgment interest for contracts is six percent per annum.  Ark. Const. art. XIX, § 13(d)(1), Ferrell v. West Bend Mut. Ins. Co., 393 F.3d 786, 797 (8th Cir. 2005) (citing Shepherd v. State Auto Prop. & Cas. Ins. Co., 312 Ark. 502, 850 S.W.2d 324, 331 (1993)).

Addressing in turn each of the Plaintiff's various requests for interest, the Court declines to award prejudgment interest on the $892,736.34 transferred to the Plaintiff on  December 15, 2005, a period of two and one-half months after the sale closed.   It would have been patently unreasonable for the sale proceeds to be placed in an interest-bearing account because JCE was instructed by Wetzel to pay the administrative claims as soon as practicable after the sale was finalized.  Moreover, there was no provision in the plan that required the funds to be held in an interest-bearing account and the Plaintiff has identified no legal basis for the awarding of interest. Similarly, the Court declines to award prejudgment interest on vacation, sick and holiday pay because the Court has found that payment of these expenses was not improper.

However, the Court finds that prejudgment interest is due on the insurance refund of

34

$49,981.11 for the period of February 8 to June 15, 2006.  The Defendants failed to remit this

sum in a timely manner and the  loss is capable of exact determination in both time and amount.

Therefore, prejudgment interest at the requested rate of 4.41% is granted at the requested sum of

$682.39.  Likewise, prejudgment interest at the rate of 6 % is granted on the workers

compensation refund of $24,310.00, which the Defendants still hold,  for the period from

January 2006 until the entry of this opinion. [8]

Finally, the Plaintiff requests interest on all other funds found to have been paid

improperly by the Defendants computed at the rate of 4.41% per annum and calculated from the

date the Plaintiff alleges the sale should have closed to the date of the judgment.  While these

sums are readily determined  by mathematical calculation, the interest must be computed from

the date the funds were improperly paid, which is the date the loss was incurred.   Therefore,

prejudgment interest on each loss must be separately calculated.  Under the above heading III B,

"Use of the Sale Proceeds to Pay Obligations of DMC," the Plaintiff proved 22 separate losses

capable of an exact determination as to amount.  Under the above heading IV, "Patient Refunds,"

the Plaintiff proved the improper payment of 28 pre-petition claims totaling $2370.65 and 33

refunds to patients who paid the new hospital a total of $8329.23 after the sale closing.

The Plaintiff has not calculated the prejudgment interest on each of these 83 losses.  In

order to receive the 4.41% interest requested, the Plaintiff is ordered to calculate  the amount of

---

[8] Unless otherwise stated, the Court directs that prejudgment interest will be calculated for a period to conclude no later than the date of entry of this opinion rather than the entry of the judgment.  Before a judgment may be entered in this case, potential issues regarding the proper amount of attorneys fees and accountants fees must be resolved.  These matters will require weeks or months and to allow prejudgment interest to accrue during that period would unfairly penalize the Defendants.

interest due for each loss  based on the exact amount of each loss as determined by the Court in this opinion and the time  the loss was incurred as shown by the record.  To the extent the time of loss is not readily ascertainable in the record, prejudgment interest is denied.

The Plaintiff has 20 days from the entry of this opinion to submit its calculations in the form of a motion for approval of the computation of prejudgment interest for losses incurred by Defendants' improper payments, including patient refunds. The Defendants will have 20 days thereafter to object to the form or method of the calculations. If an objection is filed, a hearing on the motion will be held.

Post-judgment interest will be granted to the Plaintiff at the statutory rate.

IX.

<u>CONVERSION</u>

The Plaintiff argues that the defendants are liable for the tort of conversion of the worker's compensation refund of $24,310.00, which they admit  was inadvertently deposited to DMC's account.  (Def. Brief at 35.)  He also asserts that conversion occurred when the Defendants  transferred funds from the Debtor's account to DMC's account, when the Defendants paid DMC's  liabilities with cash and sales proceeds intended for  distribution to creditors by the Plaintiff, and when the Defendants refunded overpayments from the Debtor's funds when the obligations belonged to DMC.

Conversion is a common-law tort action for wrongful possession or disposition of another's property.  <u>Buck v. Gillham</u>, 80 Ark. App. 375, 379, 96 S.W.3d 750, 753 (2003) (citing <u>McQuillan v. Mercedes-Benz Cred. Corp.</u>, 331 Ark. 242, 261 S.W.2d 729 (1998)).  Conversion

36

4:07-ap-07284 Doc#: 117 Filed: 10/20/09 Entered: 10/20/09 15:21:17 Page 37 of 44

under Arkansas law is any distinct act of dominion wrongfully exerted over property in denial of and inconsistent with the owner's rights. Schmidt v. Stearman, 98 Ark. App. 167, 173-174, 253 S.W.3d 35, 41 (2007); National Hydrovac Ind. Servs. v. Fed.. Signal Corp. (In re Nat'l Hydrovac Ind. Servs, ), 314 B.R. 753, 761 (Bankr. E. D. Ark. 2004) (citations omitted). The required intent is not conscious wrongdoing but rather an intent to exercise dominion or control over the goods that is inconsistent with the plaintiff's rights. Schmidt, 98 Ark. App. at 174, 253 S.W.3d at 41. Generally, the proper measure of damages for conversion is the market value of the property taken at the time and place of conversion. In re Nat'l Hydrovac, 314 B.R. at 762 (citing Buck , 80 Ark. App. at 379, 96 S.W.3d at 753; McQuillan, 331 Ark. at 250, 961 S.W.2d at 733 (citing Elliot v. Hurst, 307 Ark. 134, 817 S.W.2d 877 (1991); Ford Motor Cred. Co. v. Herring, 267 Ark. 201, 589 S.W.2d 584 (1979)).

To the extent JCE wrongfully exercised control over the Debtor's property, conversion has occurred. However, the proper measure of damages for conversion is the market value of the property converted. Under other legal theories discussed above, the Court has already ordered the Defendants to return the monies improperly withheld from the Debtor or wrongfully paid to other entities. Therefore, the Court finds it unnecessary to award compensatory damages for conversion because the Plaintiff will recover these damages through its breach of contract claim.

X.

PUNITIVE DAMAGES

Arkansas law authorizes an award of punitive damages for conversion. In re Nat'l Hydro-Vac, 314 B.R. at 766 (citing Dees v. Allied Fidelity Ins. Co., 655 F.Supp. 10, 12 (E.D. Ark. 1985); McKenzie v. Tom Gibson Ford, Inc., 295 Ark. 326, 331, 749 S.W.2d 653, 665

37

(1988); Williams v. O'Neal Ford, Inc., 282 Ark. 362, 365, 668 S.W.2d 545, 546 (1984); Ford

Motor Credit Co. v. Herring, 267 Ark. 201, 206-207, 589 S.W.2d 584, 558 (1979)).  Punitive

damages penalize conduct that is malicious or done with deliberate intent to injure.   Nat'l

Hydro-Vac, , 314 B.R. at  767.

Arkansas law also allows an award of punitive damages where the defendant commits a

willful and malicious act in connection with a contract.  Superior Fed. Bank v. Jones & Mackey

Const. Co., LLC, 93 Ark. App. 317, 329, 219 S.W.3d 643, 653 (2005)(citing Dews v.

Halliburton Indus., 288 Ark. 532, 708 S.W. 2d 67 (1986)).   An award of punitive damages for a

negligent act is justified "'only where the evidence indicates that the defendant acted wantonly

in causing the injury or with such a conscious indifference to the consequences that malice may

be inferred.'"  Yeakley v. Doss, 370 Ark. 122, 128, 257 S.W.3d 895, 899 (2007)(quoting

D'Arbonne Constr. Co., Inc. v. Foster, 354 Ark. 304, 308, 123 S.W.3d 894, 898 (2003)).

In this case, there were no facts presented from which malice,  reckless disregard of the

consequences, or deliberate intent to injure may be inferred.  The Plaintiff has prevailed on some

issues regarding incorrect payment of invoices.  However, some of the Plaintiff's allegations

were insubstantial or unsupported by the evidence.

The fact is that the asset purchase agreement was poorly drafted and difficult to

understand.  The employees who made disbursements under the agreement did so primarily on

instructions from counsel for the Debtor, not instructions from DMC.  It was the Debtor's plan

that  incorrectly estimated the amount of cash available to pay  unsecured creditors without

taking into consideration the amount of accounts payable that had to be paid first.

The structure of the transactions was inherently flawed because DMC, the buyer, and

JCE, the manager of the seller, are controlled by the same individual.  The parties agreed that the Debtor would be managed by JCE and that JCE would make distribution of the Debtor's money based on instructions from Debtor's counsel.  This lawsuit was bound to occur.  The Court concludes that the employees who actively made the disbursements tried to follow instructions, even though they made  mistakes.  But nothing points to malice or recklessness, only confusion. Therefore, the Plaintiff is not entitled to any punitive damages.

XI.

FIDUCIARY DUTY

The Plaintiff argues that the Defendants owed the Debtor a fiduciary duty under the Management Agreement and, further, that JCE, as manager of the Debtor, owed a fiduciary duty to the Debtor's bankruptcy estate.  The Plaintiff alleges that the pre-closing and post-closing activities complained of under other legal theories in the complaint and post-trial brief also constitute a breach of fiduciary duty.

Specifically, the Plaintiff contends that the Defendants breached their fiduciary duty by urging the Debtor's board of directors to expend monies on the rehabilitation center, advocating a later closing date, stockpiling items immediately prior to closing, failing to account for the Debtor's funds, and improperly paying certain accounts payable and patient refunds. Seeking damages for improper payments and other alleged breaches, the Plaintiff also asks for judgment for attorneys and accountants fees and for disgorgement of JCE's management fees.

The Management Agreement states:

The relationship between Manager [JCE] and Owner [Debtor] created by this agreement is one of principal and agent. The Owner and Manager are not

39

partners, joint venturers, or independent contractors, and it is agreed that Manager
is acting solely as the agent of the Owner in performing services to be provided
by Manager hereunder.

(Pl. Ex. 5.)

When a contract creates agency,  the nature and extent of the agent's authority must be
ascertained from the contract itself.  Vogelgesang v. U.S. Bank, 92 Ark.App. 116, 120, 211
S.W.3d 575, 578 (2005)(citing American Agricultural Chemical Co. v. Bond, 177 Ark. 164, 6
S.W.2d 2 (1928)).  With respect to matters within the scope of the agency, a fiduciary
relationship exists between principal and agent.  Dent v. Wright, 322 Ark. 256, 261, 909 S.W.2d
302, 304 (1995) (citing Yahraus v. Continental Oil Co., 218 Ark. 872, 239 S.W.2d 594 (1951)).

In an agency relationship, the agent is "bound to the exercise of the utmost good faith and
loyalty toward his principal or employer."  Yahraus, 218 Ark. at 875, 239 S.W.2d at 596.  The
agent must avoid acting adversely to the interests of his principal by acquiring private interests in
opposition to those of the principal. Id.  Self-dealing, absent the consent of the other party to the
relationship, is strictly proscribed.  Cole v. Laws, 349 Ark. 177, 185-86, 76 S.W.3d 878, 883
(2002) (citing Hosey v. Burgess, 319 Ark. 183, 890 S.W.2d 262 (1995)).  Self-dealing breaches
the fiduciary duty even when the action taken is innocent and unintentional.  Cole, 349 Ark. at
185, 76 S.W.3d at  883.

Generally, a fiduciary relationship also imposes a duty on the fiduciary to render a proper
accounting of the funds handled by the fiduciary, especially when the fiduciary's self interest is
involved.  Walters-Southland Institute v. Walker, 217 Ark. 602, 609, 232 S.W.2d 448, 452
(1950).

In the instant case, the Management Agreement specifically creates an agency

relationship between the Debtor and JCE. (Pl. Ex. 5.)   JCE owed a fiduciary duty to the Debtor to faithfully perform under the terms of the agreement,  to account for the sale proceeds,  and to distribute them correctly.  The Plaintiff's complaint requested that JCE be required to provide an accounting of the monies it handled.  The Court, at the conclusion of the evidence, ordered an accounting at JCE's expense because the evidence introduced at trial overwhelmingly proved that a proper accounting was never made to the Plaintiff.

After reviewing all the evidence since the trial, the Court is even more persuaded that JCE never provided a proper accounting.  The record on this issue speaks for itself and does not require an extended discussion.  The accounting of the independent accountant shows where the money went and the errors in JCE's attempts to account.  JCE never arrived at the correct beginning cash balance, and the employees who attempted to prepare the accounting admitted that they had never furnished the distribution agent with a complete and intelligible accounting.

The Plaintiff does not complain in his brief that he has not yet received a satisfactory accounting; therefore, the Court assumes that the Court-ordered accounting is sufficient, especially when considered with all of the other documents furnished to the Plaintiff by JCE. Much effort has been spent by the Plaintiff and counsel in an attempt to determine why the amount of sales proceeds received by the Plaintiff was disappointingly less than the amount estimated in the plan and by the Debtor.  The shortfall may not be the fault of the Defendants, but the Plaintiff is entitled to know why a shortfall occurred.

As to the other allegations of breach of fiduciary duty, the Court finds they are without merit.  The Defendants have agreed to pay the costs associated with the proposed rehabilitation facility; therefore, this allegation is no longer relevant on the issue of damages incurred because

of breach of fiduciary duty. (Def. Post-Trial Brief at 19-20.)  As to the delay in closing, the

Defendants did not breach  their fiduciary duty in urging a delay in closing the sale after April 1.

Indeed, the delay occurred with the knowledge and approval of the Debtor's board of directors

and counsel and appeared to be an accommodation to the buyer to ensure the sale was

consummated, an event contemplated to be  beneficial to the Debtor and its creditors. The

subsequent one-week delay in September apparently was at the urging of the Debtor's attorney

to facilitate bookkeeping procedures.  The Court finds no breach of the Defendants' fiduciary

duty in this regard.

With regard to the improper pre- and post-closing payments, including stockpiling, the

Court has reviewed the evidence and ruled  on those payments deemed to be improper under

other sections of this opinion.  As to disgorgement of management fees, the Court finds that  JCE

attempted in good faith to fulfill the duties within the scope of its employment. Therefore, no

disgorgement of fees is appropriate.

The Court will address the issue of attorneys fees subsequently.   However, the Court

does find that the Plaintiff is entitled to reimbursement of approximately $10,000.00 for the

accountants fees he incurred in attempting to determine whether the Defendants properly

remitted the sales proceeds pursuant to the agreement.

XII.

FRAUD, EQUITABLE SUBORDINATION

The Plaintiff also asks for judgment for damages on the basis of fraud, fraudulent

concealment, deceit, and punitive damages in Count IV and for equitable subordination of any

claims by the Defendants in Count VII.  The Court finds no basis for a finding of fraud or

42

equitable subordination; therefore, these counts are dismissed.

XIII.

ATTORNEY'S FEES

It has long been the rule in the United States that absent unusual circumstances, parties are not entitled to recover their attorneys fees from the opposing party unless provided for in a contract or in a state or federal statute.  United States v. Mexico Feed & Seed. Co., 980 F.2d 478, 490 (8th Cir. 1992)(citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y., 421 U.S. 240, 249-50, 95 S.Ct. 1612, 1617-18, 44 L.Ed.2d 141 (1975)); In re Hunter, 203 B.R. 150, 151 (Bankr. W.D. Ark. 1996).

The state statute provides in relevant part,

In any civil action to recover on [a] . . . contract relating to the purchase or sale of goods . . . or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

Ark. Code Ann. §16-22-308 (Michie 1994).

The Asset Purchase Agreement provides,

Buyer shall defend and indemnify Seller [Debtor] and hold Seller wholly harmless from and against any and all losses, liabilities, damages, costs . . ., and expenses (including, without limitation, reasonable attorney's fees) [arising from] . . . (iii) any material breach by Buyer [DMC] of the representations and warranties made by it in this Agreement . . ., and (iv) any material breach by Buyer of, or unexcused failure by Buyer to perform, any covenant or agreement of, or required to be performed by, Buyer under this agreement.

(Pl. Ex. 8 at ¶ 11.2.)

Additionally, the Management Agreement provides,
**Indemnity**.  Manager [JCE] shall at all times indemnify and hold harmless the Owner, its officers and directors, from and against any and all claims, losses, liabilities, actions, management and proceedings, and expenses, (including reasonable attorneys' fees) arising out of the Manager's management and operations of the Facility during the term agreement.

43

(Pl. Ex. 5 at Art. III, ¶ 9.)

As demonstrated above, the state statute, the APA, and the Management Agreement provide for the award of reasonable attorney's fees.  Much time and effort has been spent by the Plaintiff,  his counsel, and other professionals in attempting  to determine what assets and liabilities remained after the sale.  Therefore, an award of attorney's fees from JCE and DMC to Plaintiff is appropriate.

Counsel for the Plaintiff and Plaintiff shall have twenty (20) days to make application for attorney's fees awarded, and the Court will consider the application after notice and a hearing along with an opportunity for the Defendants to respond.

After a determination of the appropriate award of attorneys fees, pursuant to Section XIII, and accountants fees, pursuant to Section XI,  a separate judgment will be entered in accordance with  Federal Rule of Bankruptcy Procedure 7054.

IT IS SO ORDERED.

Dated:   10/20/2009

THE HON. JAMES G. MIXON
U.  S.  BANKRUPTCY JUDGE

DATE:_____

cc:    Kimberly Wood Tucker, Esq.
       Richard C. Downing, Esq.

44

EOD  10/20/2009
by L Schacherbauer